UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

EDGEWOOD VILLAS LIMITED
DIVIDEND HOUSING ASSOCIATION
LIMITED PARTNERSHIP,

          Debtor.

Case No.  DL 08-04858
Chapter 11
Hon. Scott W. Dales

_____/

## MEMORANDUM OF DECISION REGARDING PROPERTY VALUE

PRESENT:    HONORABLE SCOTT W. DALES
United States Bankruptcy Judge

Chapter 11 debtor-in-possession Edgewood Villas Limited Dividend Housing Association Limited Partnership (the "Debtor"), its general partner Edgewood GP, LLC, and the Debtor's equity investors Alliant Tax Credit XXV, LLC and Alliant Tax Credit Fund XXV, Ltd.[1] have proposed a reorganization plan (the "Plan") that will, if confirmed, modify the rights of its principal secured creditor PNC Bank, N.A. ("PNC").  The Debtor contends that PNC's secured claim is capped at the value of the Debtor's low income housing apartment complex in the City of Lansing, Michigan commonly known as Edgewood Villas (the "Property").  Because the parties hold dramatically different opinions of the Property's value, they asked the court to determine value by holding an evidentiary hearing on the issue (the "Valuation Hearing").  The court conducted the Valuation Hearing in Grand Rapids, Michigan on March 2 and 3, 2009.

---

[1] The court will refer to Edgewood GP, LLC, Alliant Tax Credit XXV, LLC and Alliant Tax Credit Fund XXV, Ltd. collectively as "Alliant."  With respect to the Plan, the court will refer to the Debtor and Alliant collectively as the "Plan Proponents."

This memorandum of decision constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052.

The parties did not agree as to the procedural posture of the case, specifically which of them had the burden of proof at the Valuation Hearing. In order to analyze the impact of the Plan on PNC's secured claim under 11 U.S.C. § 506(a), and more generally, compliance with 11 U.S.C. § 1129, the court must establish the amount of that secured claim. And, to establish the amount of PNC's secured claim, it is necessary to establish the value of the Property. See Fed. R. Bankr. P. 3012. Therefore, because the court held the Valuation Hearing essentially to establish the amount of PNC's secured claim, the court finds that PNC must bear the ultimate burden of proof. See, e.g., In re Schaumburg Hotel Owner Ltd. Partnership, 97 B.R. 943, 950 (Bankr. N.D. Ill. 1989).

Six witnesses testified in open court and one witness, Andrew Martin, gave his testimony at a deposition. The parties stipulated to the portions of Mr. Martin's testimony that would be admitted through the deposition transcript, and the court has reviewed those portions. In addition, the court admitted eleven exhibits, including appraisal reports and other documentary evidence, taking judicial notice of the Plan Proponents' amended disclosure statement and Plan. At the conclusion of the Valuation Hearing, and with the parties' consent, the court permitted the parties to make closing arguments by filing post-hearing briefs.

The Property is a 150-unit affordable housing project in Lansing, Michigan, placed in service in 2004. Initial financing for the Property depended upon a combination of equity investment from Alliant and others, construction loans and bonds from the Michigan State Housing Development Authority ("MSHDA"), tax credits under 26 U.S.C. § 42,[2] other credit

---

[2] At the Valuation Hearing, the witnesses and counsel referred to these tax credits as "LIHTC credits." In this opinion, the court will refer to them simply as the "Tax Credits."

enhancements including a Standby Credit Enhancement Instrument that the Federal National Mortgage Association ("Fannie Mae") issued, and letter of credit that PNC issued.

The Debtor experienced construction cost overruns and failed to secure permanent financing. Consequently, following a forbearance period, Fannie Mae drew on the PNC letter of credit. In response to Fannie Mae's demand, and pursuant to the underlying financing documents, PNC purchased the bonds in lieu of redeeming them. It also succeeded to various rights under the loan documents and mortgage, and obtained other rights as secured creditor pursuant to several documents negotiated during the prepetition forbearance period.

When the smoke cleared, PNC found itself on the petition date as the Debtor's principal secured creditor, holding a non-recourse claim against the Property in the amount of $4,663,748.22. The Tax Credits remain reserved but unconfirmed because MSHDA has yet to issue the Form 8609. Issuance of Form 8609 is evidently essential to making the Tax Credits permanent, and necessary to prevent recapture of the tax benefits already enjoyed by the Debtor's equity stakeholders.

Earlier in this case, first with respect to PNC's motion for relief from stay and later in preparation for the Valuation Hearing, the court and the parties wrestled to understand the scope of PNC's collateral package and the effect of the Tax Credits on the Property's value.[3] Understandably eager to augment the value of its secured claim under 11 U.S.C. § 506(a), PNC asserted that its mortgage and security interests included the Tax Credits. Equally inclined to

---

[3] The Plan Proponents contend, as a matter of law, that the Tax Credits were not part of PNC's secured claim, arguing that PNC could never realize their value because it would have to foreclose to do so, and the act of foreclosure would nullify the property restrictions and eliminate the Tax Credits. PNC, in contrast, assumed that the Tax Credits were part of its secured claim, having been included in the underwriting process, and qualifying as "hereditaments" or other proceeds of the real property.

minimize the value of the Property and reduce PNC's secured claim, the Debtor argued that the Tax Credits were not susceptible to hypothecation.

After extensive briefing and argument, the court concluded that PNC's lien does not reach the Tax Credits *per se* because they are neither personal nor real property. Instead, they are an incident of federal tax and housing policy. Specifically, they are the economic consequence of corresponding rights and duties between a taxpayer and its sovereign flowing from the taxpayer's agreement to restrict the use of its property in order to advance the sovereign's housing policy.[4] The court concluded, however, that the Tax Credits may, as a matter of fact, affect the value of the Property by giving the owner, or the owners of the Property's owner, the right to reduce tax liability. Therefore, although PNC cannot claim the Tax Credits directly as part of its secured claim, PNC's secured claim might derivatively capture the *value* of the Tax Credits by capturing the value of the Property itself. This is true only if a prospective purchaser of the Property would attach value to the Tax Credits when deciding what to pay for the real estate. The court held the Valuation Hearing, in part, to consider the issue.

Not surprisingly, each party called expert witnesses -- accomplished real estate appraisers -- to opine on the value of the Property, expert witnesses to testify about the value of the Tax Credits, and a principal familiar with the Property.

Each real estate appraiser used essentially the same income valuation methodology because each saw the Property as an income-producing asset. They each checked or confirmed their conclusions by reference to transactions involving properties they regarded as comparable. Neither witness placed any stock in a cost-approach to valuation, concluding that a prospective

---

[4] Though recognizing the dangers of reasoning by analogy, the court found the rights under the LIHTC program more akin to land use regulation such as zoning (not susceptible to encumbrance but affecting value), than to water rights, proceeds, products, rents, etc., or other ancient benefits flowing from property ownership.

purchaser of the Property would not do so. Therefore, the parties agreed that capitalizing the Property's Net Operating Income ("NOI") would produce a fair estimate of its value.[5] Significantly, both expert appraisers offered an opinion on value of the Property without considering the Tax Credits, and both defended their opinions as consistent with industry standards. Although each appraiser might have conceivably included the Tax Credits in assessing value for some purposes,[6] neither did with respect to the present assignment.

With respect to the Tax Credits, the parties shared little common ground. The Debtor's expert John Simon, a Sidley & Austin attorney, opined that the Tax Credits would have no effect on the Property's value, given the recent dramatic changes in the credit markets, the relatively modest size of the apartment complex, and the stigma in the marketplace regarding LIHTCH properties in the Midwestern United States, and in particular, Michigan. Mr. Simon's testimony was credible and persuasive, especially because it took into account the present state of the Tax Credits -- namely, that MSHDA has not issued the Form 8609 -- as well as the Property's troubled history. His point, in short, was that any entity remaining in the tax credit market after the departure of Fannie Mae and Freddie Mac can afford to be picky. They would not likely be induced to invest in property in Lansing, Michigan with a history of financial difficulties and tenant problems, simply to realize a relatively paltry amount of remaining tax credits. This prediction includes the assumption that a new owner could persuade MSHDA to bless or perfect the Tax Credits by issuing a Form 8609. Keeping all these difficulties in mind, Mr. Simon testified, most market participants would look elsewhere.

---

[5] The appraisers differed, however, with respect to their forecast of NOI and the capitalization rate (the "Cap Rate").

[6] See Martin A. Skolnik, Valuation of Subsidized Housing as Applied to Assessment Criteria, Published in the 1997 Conference Proceedings, International Association of Assessing Officers and Presented September 16, 1997, available at http://www.realestate-consulting.com/articles/Tax%20Credit%20Article%20as%20published.pdf.

In contrast, PNC's expert Brad Beggs, testified credibly that the market for tax credits is not moribund, and although distressed by recent economic turmoil and the departure of big players, would nevertheless pay approximately 66% of face value for each dollar of the Tax Credits. Mr. Beggs took a more academic approach to LIHTC tax credits, and spoke generically without giving too much weight to the special circumstances of this case. Mr. Simon's approach on the other hand, was infused with more grit and common-sense. This was probably due to his 18 years of experience in advising national tax credit investors and engaging in the "unauthorized practice of business." In the court's view, the Plan Proponents' emphasis on Mr. Simon's business experience, bolstered his credibility as an expert.

The court also permitted PNC Executive Vice President Robert Courtney to testify as a lay witness, over the Plan Proponents' objection. His testimony, based on his recent purchases of LIHTC tax credits for his employer, suggested there is a market for LIHTC tax credits in Michigan, even with respect to existing properties. However, on cross-examination he conceded that PNC has not purchased LIHTC tax credits where a housing agency has not issued Form 8609 and the property was placed in service several years ago.

It is reasonable to conclude that even though the LIHTC market continues to operate, no one would attach significant value to provisional tax credits on a five year-old troubled property, unblessed by Form 8609. The court finds the Plan Proponents' expert more persuasive, and concludes that, in the present state of the economy and particularly with respect to this Property, the Tax Credits do not affect its value.

This conclusion finds support in the reports both real estate appraisers produced for the hearing. Strikingly, neither appraiser felt the need to take the Tax Credits into account when giving his or her opinion of what a willing buyer would pay a willing seller for this Property.

When asked why they did not take the Tax Credits into account, each appraiser said they were not asked to do so. Both said they were valuing the "fee interest." Mr. Bur, PNC's commercial real estate appraiser, made it clear that the Tax Credits have a value separate from the Property itself. See Transcript Vol. II, pp. 299-300. When PNC's counsel asked Mr. Bur on re-direct about the effect of the unissued Form 8609 on the Property's value, a significant exchange occurred:

Q. . . . So questions were raised with respect to the 8609 and impact that might have had on your cap rate. Do you recall those questions?

A. Yes.

Q. You indicated that there would not be an impact. Could you explain to us why that [sic] there would not be an impact or why you wouldn't consider an impact?

A. The 8609s do not affect the value of the real property. They affect -- I don't know if they would or not, I didn't do the analysis. *But if they had any impact, it would be on the value of the tax credits, it wouldn't be on the value of the real property.*

Transcript Vol. II, p. 300 lines 5-15 (emphasis added). So it appears that PNC's own real estate appraiser did not link the Tax Credits to the Property value, but clearly valued them separately.

The court also infers, from the testimony of Messrs. Simon and Beggs, that as a practical matter, the tax benefits associated with this type of property are enjoyed at the investor level, rather than the property-owner level, presumably because developers typically structure LIHTC projects as limited partnerships or similar entities, and such entities are not subject to federal income taxation. See Low Income Housing Tax Credits: Affordable Housing Investment Opportunities for Banks, Office of the Comptroller of the Currency, Feb. 2008, available at http://www.occ.treas.gov/ftp/release/2008-10a.pdf (discussing typical structures); 26 U.S.C. § 701 ("A partnership as such shall not be subject to the income tax imposed by this chapter [but] [p]ersons carrying on business as partners shall be liable for income tax only in their separate or

individual capacities"); 26 C.F.R. § 1.701-1.  In other words, the entities that invested in the Debtor (a limited partnership) enjoy the benefits of having the Debtor's tax attributes pass through to the investors in the limited partnership.  The market captures that benefit or value by trading the ownership interests in the limited partnership rather than by selling the real estate itself.  In this way, market mechanisms divorce the tax benefits from the Property (or at least permit them to be traded separately), even though the Tax Credits depend upon the LIHTC property restrictions.  Consequently, both parties' real estate appraisers offered opinions of value of the "fee interest" in the Property -- defined by both appraisers as "[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat" -- completely independent of the Tax Credits, but mindful of the LIHTC property use restrictions.  See Bank's Exh. D at p.3; Debtor's Exh. 4 at p. 18.

Moreover, PNC's witness, Mr. Courtney, credibly testified that his employer took the tax credits into account when underwriting the transaction initially.  But, lenders take into account a variety of issues in determining whether it makes sense to invest in a project, including intangibles that fall outside the lender's collateral package.  They consider the expertise of management, the credit worthiness of borrowers and guarantors, land use restrictions, and market conditions.  With respect to borrowers structured as limited partnerships, they might consider the credit worthiness of the general partner who, under the agreements and applicable law, must stand behind the limited partnership's undertakings.  Certainly it makes sense to consider the effect of the Tax Credits on the ability and willingness of these entities to stand behind the project -- a natural subject of the underwriting decision.  But if a lender intends to capture the tax benefits associated with a LIHTC property, the surest way to do so is to either encumber the

partnership interests or take an equity stake directly in the borrower.  This is where the benefit of the Tax Credits ultimately rests.

In sum, because the Tax Credits did not affect the appraisers' opinion of the Property value, the Tax Credits do not affect the court's opinion of value.

In view of the foregoing, the dispute becomes a battle of the experts, in this case Ms. Shipman, the Plan Proponents' real estate appraiser, and Mr. Bur, PNC's real estate appraiser. The expert opinion, in turn, influences the court's view of projected NOI and the Cap Rate -- the two main determinants of value under the income approach.  Taking the last issue first, the court accepts Ms. Shipman's 9.5% Cap Rate, because the cross-examination of Mr. Bur regarding his Cap Rate revealed that it was premised on older transactions and transactions that had not yet closed.  Ms. Shipman's Cap Rate, though also premised on 2007 transactions, cross-checked the market-derived rate against a survey of non-institutional grade apartment properties such as the Property, which averaged 9.67%.  She concluded that 9.50% was reasonable and the court sees no reason to disagree.[7]

The total operating expenses and replacement reserves that each expert predicted were substantially the same -- approximately $619,000.00.  Compare Bank Exh. D, p. 50 with Debtor Exh. 4, p. 11.  Given the modest differences in projected gross rents, and given the nearly identical operating expenses in each report, the parties' respective forecasts of NOI (and ultimately value) diverge because they have differing views of other income, projected vacancy, and credit losses.  The court however, is not inclined to wholly accept either expert's NOI figures because it perceives slight defects in both.

---

[7] PNC's closing brief states the difference in the Cap Rate accounts for at most a difference in value of $120,000.00.

Ms. Shipman observed that the Property is performing "below market expectations, apparently due to prior management issues," but her projected NOI did not adequately consider likely improvements under the new property manager's supervision. New management appears to enjoy a good reputation nationally. Moreover, Mr. Doran's account of the Debtor's recent management changes, including a remarkable variety of innovative social services designed to attract and cater to the target tenant group, persuades the court that Ms. Shipman's NOI is unduly pessimistic, and rooted too deeply in the past management's misadventures.[8] Although Ms. Shipman nodded to the new management, and noted that "[s]ince the management change, the bad debt expense has declined rather dramatically," she nevertheless forecasts that a 30% vacancy and collection loss would continue. Moreover, Mr. Doran testified that the Property had achieved 83% occupancy as of the Valuation Hearing, at a time in the yearly rent cycle when both Mr. Doran and Mr. Bur agreed, historically, occupancy should be at its ebb. Mr. Doran testified that he expected occupancy to climb during the spring and summer months, then recede again later in the year. Under the circumstances, Ms. Shipman's 30% vacancy and credit loss prediction appears to be unreasonably high.

For his part, Mr. Bur predicted a stabilized occupancy at 90% within a year, and credit and vacancy loss at approximately 12% of potential gross income. This seems unreasonably optimistic particularly given that he noted a change in the real estate cycle from "slowdown" to "contraction." He defines a period of "contraction" as one characterized by "declining occupancy and absorption rates, decreasing prices, and ultimately a falloff in development activity." See Bank Exh. 4 at p.14. Yet, later in his report, he acknowledged the Property's average occupancy of 74% in 2007 and 75% in 2008, and predicted a "one-year absorption period to stabilize occupancy at 90%," assuming management does a "better job of finding and

---

[8] Mr. Doran is the president of Alliant Real Estate Investment, LLC.

retaining tenants." Bank Exh. 4 at p. 42. In his most recent report, Mr. Bur also projected a credit loss factor of 2%. This seems inconsistent with a worsening economy, particularly one experiencing the dramatic declines we are now experiencing, as each expert witness acknowledged. Moreover, in making his estimate of credit loss, Mr. Bur reviewed the experience of other low income properties including some that benefit from the Federal Housing Administration's "Section 8" program. Section 8 properties evidently have different credit loss experience than non-Section 8 properties because the government subsidizes rent in the form of direct payments and vouchers. For the time being, at least, the federal government's credit rating is superior to the typical low-income apartment dweller's.

The witnesses who addressed the subject, including Mr. Martin who testified by deposition, all agreed that the economic outlook for the housing market in our state is not a rosy one. Unemployment rates in the Lansing area are generally climbing higher, with rates in the City of Lansing recently reaching 12%. It is reasonable to infer from Mr. Bur's testimony, that rising unemployment may stimulate demand for rental housing, and in particular low income rental housing. But, it is also reasonable to believe, as Mr. Bur conceded on cross-examination, that hard times will probably increase bad debt or collection losses. Moreover, the court finds that since general market rental rates have declined to the point where they now approach rents at the Property, the Debtor may feel pressure to reduce its rents to compete with non-LIHTC properties. Therefore, it is reasonable to assume that for the same rental dollar, tenants may be attracted to non-LIHTC properties offering more amenities, in more desirable neighborhoods. This may further depress the Property's NOI and increase vacancy rates.

The court is reluctant to substitute its judgment for the judgment of either appraiser, both of whom have impressive credentials and testified credibly and helpfully. Yet, unlike Ms.

Shipman and Mr. Bur, the court is duty-bound to consider the entire record. The court's decision reflects to some extent an extrapolation or compromise between the two viewpoints, but is based on reasonable inferences drawn from the testimonial and documentary evidence admitted at trial.

Ms. Shipman's Adjusted Gross Potential Rental Income ($1,153,584.00) plus "other income" in the amount of $20,000.00 is substantially equivalent to Mr. Bur's Effective Gross Income ($1,161,744.00), as both reflected predictions of potential rental income and other income. The difference in the two figures comes principally from Mr. Bur's greater prediction of "other income," and his forecasting $50.00 per unit per month less income attributable to the two bedroom units. The court credits Mr. Bur's testimony that the Debtor has reduced rents for its 2 bedroom apartments, and although the reduction is presently regarded as a 12 month promotional rent, realistically the Debtor will find it difficult to raise the rent after 12 months without triggering costly tenant turnover. Ms. Shipman's view of other income, which draws from the Property's historical performance and finds support in Mr. Doran's testimony (Transcript Vol. II, pgs. 202-03), is more realistic than Mr. Bur's prediction which is primarily based upon comparables. See Transcript, Vol. II, pg. 240. The court, therefore, predicts an Effective Gross Income in the amount of $1,121,744.00.

Next, and crucially, the court must make its own prediction of vacancy and credit loss. The court has considered the testimony, all of which was credible and helpful, and has reviewed the appraisals, the other exhibits, and the parties' closing arguments. The court is mindful, too, that the state and its capital's economy are in turmoil, because both are dependent to a considerable extent on the ailing auto industry. Families in the area will lose jobs, suffer furloughs, loss of overtime, or worse, and be forced to look for alternative housing. Those already residing in the Property will also suffer economic hardship and eviction, offsetting to

some extent the increased demand for rental housing that accompanies increasing foreclosures. Consequently, the court finds a fair prediction of vacancy and credit loss is 20%, representing a stabilized vacancy rate of 15% plus 5% collection loss. The following table summarizes the court's conclusion and calculation:

| Item | Amount/Rate | Comment/Source |
|---|---|---|
| Potential Gross Income ("PGI") | $1,121,744.00 | Bank Exh. D, pg. 50 and Debtor's Exh. 4, pg. 11 |
| Less Vacancy and Credit Loss (20% of PGI) | ($224,349.00) | The court's estimate |
| Less Total Operating Expenses | ($619,377.00) | Bank Exh. D, pg. 50 and Debtor's Exh. 4, pg. 11 |
| Net Operating Income | $278,018.00 | |
| Capitalization Rate | 9.50% | Debtor's Exh. 4, pg.11 |
| **Value (NOI ÷ .095)** | **$2,926,505.00** | |

After deliberation, therefore, the court concludes that the value of the Property is $2,926,505.00. As noted above, the court makes no additions for the value of the Tax Credits, because the appraisers made no such additions, and PNC failed to establish that these particular Tax Credits added value to the Property.

Arriving at a value of real property based primarily on capitalizing NOI (without considering the Tax Credits) may seem counter-intuitive, yet both appraisers expressed confidence in this same methodology when valuing a fee simple interest in the Property. The court is unwilling, based on its own intuition, to second-guess the two experts who agree on the methodology for valuing the real estate, even though they did not agree on its value. For what it is worth, the court suspects that, given the pass-through nature of the Tax Credits and the necessity of capturing value by trading partnership interests, as a practical matter the tax benefits inure to the equity holders in the entity that owns the LIHTC project, rather than the owner of the

project itself.  Capturing the tax benefits requires capturing the equity interest by pledge, direct investment in partnership interests, or otherwise.  Even though an accidental lender in this transaction, PNC failed to capture the value of the Tax Credits, and must acknowledge the limits the record and the law place on its secured claim.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall enter a separate judgment in accordance with Fed. R. Bankr. P. 7052 and 9021, and Fed. R. Civ. P. 52 and 58, declaring the Property's value to be $2,926,505.00.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision Regarding Property Value, and the separate judgment referred to herein, pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Edgewood Villas Limited Dividend Housing Association Limited Partnership, Robert D. Gordon, Esq., Margaret Mann, Esq., PNC Bank, N.A., William H. Shorling, Esq., and Rozanne M. Giunta, Esq.

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: March 20, 2009**